IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL ACTION FILE NO.  4:10-CR-05-RLV-WEJ |
| ALBERT VERNON NORTON, | |
| Defendant. | |

## **NON-FINAL REPORT AND RECOMMENDATION**

This matter is before the Court on defendant Albert Vernon Norton's Preliminary Motion to Suppress Statements [23] and Preliminary Motion to Suppress Evidence [24]. The Court conducted an evidentiary hearing on said Motions on June 23, 2010 [31], which has been transcribed [32]. The parties have briefed the matter. (See Br. Supp. Mot. Supp. Statements and Mot. Supp. Evid. [36] ("Def.'s Br."); Govt.'s Resp. Def.'s Mot. Supp. Statements and Mot. Supp. Evid. [40] ("Govt.'s Br.").)

On the basis of the testimony and evidence produced at that hearing, the undersigned **REPORTS** that law enforcement officers complied with the requirements of Miranda v. Arizona, 384 U.S. 436 (1966), and that defendant

voluntarily made incriminating statements. Thus, the undersigned **RECOMMENDS** that defendant's Preliminary Motion to Suppress Statements [23] be **DENIED**. The undersigned further **REPORTS** that defendant's attack on the affidavit made in support of the warrant that officers relied upon to search his residence is insufficient under Franks v. Delaware, 438 U.S. 154 (1978). Therefore, the undersigned also **RECOMMENDS** that defendant's Preliminary Motion to Suppress Evidence [24] be **DENIED**.

## I.   STATEMENT OF FACTS

Georgia Bureau of Investigation Special Agent Renea Anderson was conducting an investigation of the defendant, Albert Norton, for suspected receipt of child pornography.[1] As part of that investigation, on January 11, 2010, she sought and obtained a search warrant from the Superior Court of Murray County for the defendant's residence, which is located at 1178 Highway 225 South, Lot 56, in Chatsworth, Georgia. (Tr. 7-9, 20; see also Govt. Ex. 1 (search warrant); Govt. Ex. 2 (affidavit and application).)

---

[1] SA Anderson is a member of the GBI's Internet Crimes Against Children Task Force. This task force specializes in conducting investigations into child pornography. (Tr. 7-8.)

2

SA Anderson, accompanied by agents from the GBI, the Secret Service, and the Murray County Sheriff's Office, executed the search warrant on Thursday, January 12, 2010, at approximately 8:00 a.m. (Tr. 9, 20.)[2] The officers (approximately eight in number) were armed and dressed in clothing that identified them as law enforcement officers. (Id. at 9-11, 18-19, 22.) SA Anderson utilized a recording device during execution of the search warrant. (Tr. 9-10, 11-12; Govt. Ex. 4 (audio CD).)[3]

At approximately the 2:46 mark on the audio CD, officers knocked on the door of the defendant's residence and announced their intentions. (Tr. 12-13.) When no one answered and no noises were heard, SA Anderson opened the unlocked door; some of the officers with her entered. (Id. at 19-20.) Thereafter, officers encountered Mr. Norton still in bed, identified themselves, and informed him that

---

[2] The defendant's residence was a two or three bedroom mobile home with a front porch. (Tr. 13.) It was so dilapidated that Murray County subsequently condemned and demolished it. (Id. at 25-26.)

[3] The Court supplements its summary of the audio CD with citations to pages of the transcript where a witness testifies about portions of the CD which were played in open court.

3

they had a search warrant. Officers asked Mr. Norton to dress,[4] and followed up with questions about whether there were guns in the residence and who else lived there. (Id. at 13-14, 27.)

At approximately the 4:50 mark on the audio CD, SA Anderson identified herself to Mr. Norton and gave him a copy of the search warrant. In response to his question about what agents were looking for, SA Anderson told him that they were looking for child pornography. SA Anderson told Mr. Norton that he was not under arrest, but that she wanted to talk to him. Because the residence was crowded with officers and rather cluttered, SA Anderson suggested that they go outside to talk, or because it was cold outside, to the Sheriff's Office. (Id. at 13.) Mr. Norton agreed to talk outside, and after obtaining a pair of shoes and a soda, he went outside with the officers to the porch area. (Id. at 14, 33.) The audio CD contains numerous references to the cold weather that morning and the officers' concern for Mr. Norton's comfort and well being. (Id. at 15.)

---

[4] When SA Anderson saw Mr. Norton, he had dressed in sweat pants and a fleece jacket. (Tr. 14.) SA Ward recalled that Mr. Norton was also wearing glasses, but could not recall with certainty whether he was still wearing those glasses when interviewed in the agent's vehicle (discussed infra). (Id. at 41.)

4

At approximately the 8:24 mark on the audio CD, Secret Service Special Agent Joey Ward began asking background questions of the defendant, such as his name, date of birth, SSN, telephone number, health condition, employer, and length of employment. (Tr. 32-33, 38.) At approximately mark 9:30 on the audio CD, SA Anderson reminded the defendant that she had initially informed him that he was not under arrest and that she wanted to talk to him about child pornography; however, his status had changed with the discovery of marijuana plants in his trailer. Accordingly, she told him that officers were going to read the Miranda rights to him, and that after hearing those rights, he could then choose to talk to her about the marijuana or child pornography.

Beginning at approximately the 10:47 mark on the audio CD, SA Ward read the Miranda rights to the defendant. (Tr. 33, 38.) To do so, SA Ward used a form entitled "Warning and Consent to Speak" (which his agency identifies as SSF 1737B). (Id. at 33-34; see also Govt. Ex. 3 (form).) The "Warning of Rights" portion of that form provides as follows:

You must understand your rights before we ask you any questions.

You have the right to remain silent.

5

>   Anything you say can be used against you in court, or other proceedings.
>
>   You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning.
>
>   If you cannot afford a lawyer and want one, a lawyer will be appointed for you by the court.  If you decide to answer questions now without a lawyer present, you will still have the right to stop the questioning at any time.  You also have the right to stop the questioning at any time until you talk to a lawyer.

(Govt. Ex. 3; see also Audio CD mark 10:47 - 11:08.)[5]

When SA Ward finished reading these rights to Mr. Norton, the agent asked the defendant if he understood those rights.  The defendant replied that he did.  When asked if he wanted to talk to agents, defendant said, "I guess."  (Tr. 39; see also Audio CD mark 11:08 - 11:11.)

Thereafter, SA Ward told Mr. Norton that he needed his signature on the form to confirm that his rights had been read to him, that he was willing to talk to agents, and that he had not been coerced into speaking to them.  (Tr. 34; see also Audio CD mark 11:20 - 11:35.)  At 8:40 a.m., the defendant signed his name at three separate places on the Warning and Consent to Speak form (Govt. Ex. 3).

---

[5] A comparison of the audio CD to the Warning and Consent to Speak form shows that SA Ward's reading of the Miranda rights matched what is printed on the form.

SA Ward testified that he stood beside the defendant as he read the form to him. (Tr. 35.) However, he did not look at the defendant to see if he was paying attention as he read. (Id.) After he completed reading the form, SA Ward handed it to the defendant so that he could examine it. The agent saw the defendant look over the form, and he assumed that he read it. (Id.) After looking over the form, the defendant signed it, with SA Ward as the witness. (Id. at 35-36.)

The aforementioned "Warning and Consent to Speak" form merits more description. It requires three signatures from the person questioned. In the "Warning of Rights" section, immediately after the Miranda warnings but before the signature line, the form states: "I have read this statement of my rights and it has been read to me, and I understand what my rights are." (Govt. Ex. 3.) Mr. Norton signed his name under that acknowledgment. (Id.)

The form then contains a "Waiver" section. Immediately before the signature line, the form provides as follows:

> I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or force of any kind has been used against me. I hereby voluntarily and intentionally waive my right to remain silent and my right to have an attorney at this time. I am willing to make a statement and answer questions.

7

(Govt. Ex. 3.) Mr. Norton signed his name after the above-quoted waiver. (Id.)

Finally, there is a "Certification" section, which reads as follows: "I hereby certify that the foregoing Warning of Rights and Waiver were read by me to the above signatory, and that he also read it and has affixed his signature hereto in my presence." (Govt. Ex. 3.) The defendant signed the certification along with SA Ward. (Id.) Despite the language of that certification, SA Ward only read the Miranda rights to defendant, not the remainder of the form (such as the "Waiver" or "Certification" sections). (Tr. 39.) However, as noted above, SA Ward did, after reading the Miranda rights to defendant, ask him if he understood those rights and whether he was willing to speak to the agents. He replied that he was. (Id.)

The defendant executed the form while standing on the porch to his trailer. (Tr. 41.) SA Anderson then told the defendant that, given the cold, they would continue the interview in SA Ward's vehicle (a Ford Explorer). SA Anderson and Ward accompanied the defendant to that vehicle, but he was not placed in handcuffs. (Id. at 26, 36, 41.) At approximately the 14:14 mark on the audio CD, SA Anderson began questioning the defendant, focusing first on his computer equipment and then on child pornography. The defendant made incriminating statements during that questioning about downloading and storing child pornography. (Id. at 38.)

8

At no time during the questioning did Mr. Norton refuse to answer a question or ask for an attorney. (Tr. 17, 37.) No officers made physical contact with the defendant; he was not threatened or promised anything in exchange for making a statement. (Id. at 17-18, 36-37.) He was cooperative and provided answers that were responsive to the questions asked. (Id. at 18, 36, 38-39.)

## II.   THE CHARGING DOCUMENTS

The undersigned issued a Criminal Complaint [1] against Mr. Norton on January 21, 2010, which charges that the defendant did, using any means or facility of interstate or foreign commerce, knowingly receive a visual depiction, the production of which involved the use of children engaging in sexually explicit conduct, and knowingly possess such a visual depiction, in violation of 18 U.S.C. § 2252(a).

On February 23, 2010, the grand jury returned a two-count Indictment [8] against Mr. Norton concerning conduct allegedly occurring in this District. Count One alleges that, beginning on a date unknown, but at least by January 12, 2010, the defendant knowingly received one or more visual depictions of minors engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2), said depictions having been (a) produced using minors engaging in sexually explicit conduct, and (b)

9

shipped and transported in interstate and foreign commerce, by any means, including by computer, all in violation of 18 U.S.C. § 2252(a)(2) and (b). (Indict. Count One.) Count Two charges that, beginning on a date unknown, but at least by January 12, 2010, the defendant knowingly possessed a computer that contained one or more visual depictions of minors engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2), said depictions having been (a) produced using minors engaging in sexually explicit conduct, and (b) shipped and transported in interstate and foreign commerce, by any means, including by computer, all in violation of 18 U.S.C. § 2252(a)(4)(B).

### III.    CONTENTIONS OF THE PARTIES

Defendant asserts that he did not voluntarily waive his Miranda rights; thus he contends that incriminating statements he made to law enforcement officers must be suppressed. (Def.'s Br. 4-11.) Additionally, Mr. Norton argues that the evidence seized following execution of the search warrant should be suppressed because the underlying affidavit was defective in failing to detail the affiant's expertise and experience. (Id. at 11-12.)

The Government responds that SA Ward read the Miranda rights to the defendant, and that his decision to waive those rights was voluntarily, knowingly,

10

and intelligently made. (Govt.'s Br. 5-10.) Finally, the Government asserts that Mr. Norton's challenge to the search warrant affidavit failed to meet the substantial burden imposed by Franks v. Delaware. Moreover, even if that threshold had been met, the Government contends that the affidavit established probable cause for issuance of the search warrant, and that officers executing it are entitled to the good faith exception articulated in United States v. Leon, 468 U.S. 897 (1984).

## IV.   ANALYSIS

### A.   Motion to Suppress Defendant's Statements

In Jackson v. Denno, 378 U.S. 368, 376-77 (1964), the Supreme Court held that a defendant has a constitutional right to a fair hearing and an independent and reliable determination of the voluntariness of a confession before it is allowed to be heard by a jury. Title 18 U.S.C. § 3501(a) codifies the Jackson v. Denno requirement for criminal prosecutions and provides that, before a confession or self-incriminating statement is received in evidence, "the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness." United States v. Davidson, 768 F.2d 1266, 1270 n.1 (11th Cir. 1985).

A two-part inquiry determines the admissibility of a confession or self-incriminating statement. First, the Court must consider whether the Government

11

complied with the requirements of Miranda v. Arizona, 384 U.S. 436 (1966). Second, if those requirements were met, the Court must consider whether the confession or self-incriminating statement was voluntary. United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994) (per curiam); United States v. Sims, 719 F.2d 375, 378 (11th Cir. 1983) (per curiam). The Court makes these inquiries separately below.

### 1.     Compliance with Miranda

In Miranda, the Supreme Court noted that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." 384 U.S. at 478. Therefore, the Court held that the procedural safeguard of warning the suspect of his constitutional rights must be instituted to protect the privilege. Id. at 478-79. These so-called Miranda warnings "are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989).

The testimony at the hearing shows that SA Ward read the Miranda rights to the defendant. Therefore, the undisputed evidence shows that defendant received

12

notice of his rights before he was subjected to custodial interrogation and made any incriminating statements. Thus, the first prong of the two-part inquiry has been established.

### 2. Voluntariness

Determining whether a confession or incriminating statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. Jones, 32 F.3d at 1516. In Arizona v. Fulminate, 499 U.S. 279, 285-88 (1991), the Supreme Court held that the issue of voluntariness is determined by the totality of the circumstances. In evaluating the totality of the circumstances, the district court must assess whether law enforcement conduct was "causally related" to the confession. Jones, 32 F.3d at 1516-17. The standard applied in the Eleventh Circuit is as follows:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

13

Id. at 1517 (quoting United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th Cir. 1992)), abrogated on other grounds, Coleman v. Singletary, 30 F.3d 1420 (11th Cir. 1994).

In this case, the evidence shows that Mr. Norton was not subjected to an exhaustingly long interrogation. Instead, the interrogation lasted for less than an hour and officers paid close attention to Mr. Norton's comfort, making sure he had clothes, shoes, a soda, and shelter from the cold. Moreover, physical force was neither applied to Mr. Norton nor threatened against him. He was also not promised anything to induce an confession.

Defendant contends, however, that he was the victim of police deception. Specifically, Mr. Norton argues that he was first informed that officers were searching his home for evidence of child pornography, that he was not under arrest, and that officers only wanted to talk to him. However, as SA Ward began talking to him, SA Anderson interrupted with news that marijuana plants had been found, and that it was now necessary for officers to read the Miranda rights to him. After the defendant waived his Miranda rights, officers took him to a vehicle and questioned him about child pornography. Only after obtaining incriminating statements about child pornography did officers turn to the reason the waiver was obtained–the

14

marijuana plants. Defendant asserts that this "bait and switch" maneuver rises to the level of deceit constituting coercion. (Def.'s Br. 8.)

The problem with defendant's argument is that no trickery occurred. As defendant properly concedes, SA Anderson advised him "during the reading of <u>Miranda</u> that she wanted to talk with him about child pornography in addition to the marijuana plants." (Def.'s Br. 9.) Thus, it is not the case that Mr. Norton waived his rights for one potential crime but was interrogated about another. Instead, he waived his rights as both potential crimes.

It is true that, despite the signed certification, SA Ward did not read the entire Warning and Consent to Speak form to Mr. Norton. Instead, he read only the <u>Miranda</u> rights to the defendant. However, SA Ward did ask the defendant if he understood those rights, and he replied that he did. Although SA Ward did not read the waiver section of the form to the defendant, he asked him the pertinent question–was he willing to talk to law enforcement? Mr. Norton replied, "I guess." Additionally, SA Ward handed the form to the defendant and gave him the opportunity to review it before he signed it in multiple places. Thus, under the totality of the circumstances, the Court must conclude that Mr. Norton made a

15

knowing, voluntary, and intelligent waiver of his right to remain silent. Therefore, his incriminating statements should not be suppressed.

### B. Motion to Suppress Evidence

Affidavits in support of arrest and search warrants are presumptively valid. Franks, 438 U.S. at 171; see also United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009). To be entitled to an evidentiary hearing under Franks, a defendant must make a "substantial preliminary showing that the affiant made false statements, either intentionally or with reckless disregard for the truth, pointing specifically to the portions of the affidavit claimed to be false, and that the false statements were necessary to a finding of probable cause." Franks, 438 U.S. at 171; see also Kapordelis, 569 F.3d at 1309.

Here, defendant does not assert that the affiant made false statements that were necessary to a finding of probable cause. Instead, he asserts that SA Anderson's affidavit is insufficient because she "did not explain her personal expertise regarding the technologically advanced method of identifying Mr. Norton's computer as the alleged destination for child pornography downloads," and that she "did not explain her personal expertise regarding the sweeping conclusions she made relating to the idiosyncracies of those who receive child pornography." (Def.'s Br. 11-12.)

16

Because defendant's challenge to the affidavit is based upon the purported lack of detail regarding Agent Anderson's training and expertise, it is insufficient to meet the standards outlined supra in Franks. Accordingly, Mr. Norton's challenge to SA Anderson's affidavit must fail.

In any event, the affidavit underlying the search warrant is sufficient. "Probable cause to support a search warrant exists when the totality of the circumstances allows the conclusion that 'there is a fair probability that contraband or evidence of a crime will be found in the particular place.'" Kapordelis, 569 F.3d at 1310 (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)). The affidavit here shows that there was a fair probability that fruits and instrumentalities of a crime would be found at the defendant's property. Finally, even if the search warrant affidavit were insufficient, the so-called "good faith exception" applies. See Leon, 468 U.S. at 922; see also United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) (evidence should not rendered inadmissible if it is "obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause"). In this case, officers acted in reasonable reliance upon a search warrant issued by the Superior Court of Murray County. Thus, no evidence seized in the defendant's home should be suppressed.

17

## V.      CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that defendant's Preliminary Motion to Suppress Statements [23] and Preliminary Motion to Suppress Evidence [24] be **DENIED**.

**SO RECOMMENDED**, this 15th day of October, 2010.

_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | CRIMINAL ACTION FILE |
| v. | NO. 4:10-CR-05-RLV-WEJ |
| ALBERT VERNON NORTON, | |
| Defendant. | |

**ORDER FOR SERVICE OF**
**NON-FINAL REPORT AND RECOMMENDATION**

Let this Non-Final Report and Recommendation of the United States Magistrate Judge, made in accordance with 28 U.S.C. § 636(b)(1)(B) and the Court's Local Criminal Rule 58.1(A)(3)(a), be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Non-Final Report and Recommendation within fourteen days of the receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to any transcripts if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing

AO 72A
(Rev.8/82)

for review by the District Court. If no objections are filed, the Non-Final Report and Recommendation may be adopted as the opinion and order of the District Court, and any appellate review of factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curiam).

The Clerk is directed to submit the Non-Final Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED**, this 15th day of October, 2010.

_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE